T.C. Memo. 2004-103

UNITED STATES TAX COURT

PADGETT COVENTRY PRICE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7939-01.                    Filed April 22, 2004.

Padgett Coventry Price, pro se.

Louis B. Jack and Julie E. Vandersluis, for respondent.

Sherri Wilder (specially recognized), for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined the following deficiencies in, additions to, and penalties on petitioner's Federal income taxes:

|      |            | Additions to Tax | | Penalties | |
|      |            | Sec. 6653 | Sec. 6653 | Sec. | Sec. |
| Year | Deficiency | (a)(1) | (b)(1) | 6663 | 6662(a) |
| 1988 | $25,632 | $749 | $7,987 | – | -- |
| 1989 | 42,187 | -- | – | $17,709 | $2,622 |
| 1990 | 56,315 | -- | – | 31,889 | 2,580 |
| 1991 | 23,063 | -- | – | 3,650 | 3,319 |

Unless otherwise indicated, all section references are to the
Internal Revenue Code in effect for the years in issue, and all
Rule references are to the Tax Court Rules of Practice and
Procedure.  All figures are rounded to the nearest dollar.

The primary issue for decision is whether petitioner is
liable for the addition to tax and penalties for fraud based on
unreported income from her law practice.  Additional issues are
whether (1) petitioner is entitled to certain Schedule C, Profit
or Loss From Business, deductions; (2) petitioner is entitled to
certain Schedule E, Supplemental Income and Loss, losses; and (3)
petitioner is liable for additional self-employment tax.

FINDINGS OF FACT

As made absolute by the Court's orders dated December 6,
2002, and February 3, 2003, some of the facts have been deemed
stipulated and are so found.  The first stipulation of facts, the
second stipulation of facts, and the attached exhibits are
incorporated herein by this reference.  At the time she filed the
petition, petitioner resided in Corona, California.

Petitioner's Education and Legal Background

On June 15, 1971, petitioner received a bachelor of arts

degree with honors from the University of California Riverside. In December 1983, petitioner received a juris doctor degree from Western State University College of Law. On June 13, 1984, petitioner was admitted to the California bar.

## Petitioner, Mr. Ludlow, and Ludlow & Price

From the early 1960s until 1985, Thomas H. Ludlow practiced law as a sole practitioner. In September 1985, Mr. Ludlow began practicing law with petitioner as "Ludlow & Price" (the law firm). During the years in issue the law firm was located in Corona, California, at either 212 or 812 East Grand Boulevard.

In January 1986, petitioner and Mr. Ludlow married. During the years in issue, petitioner and Mr. Ludlow were married and lived together at 1860 Kellogg Avenue, Corona, California. During the years in issue, petitioner and Mr. Ludlow filed joint Federal income tax returns, and they reported their law firm income, expenses, and profits on a Schedule C.

## Mr. Ludlow's Health

Starting in 1982 or 1983, Mr. Ludlow began having heart problems. In late 1985 or early 1986, Mr. Ludlow had a massive heart attack. In 1993, Mr. Ludlow died.

## Hiring of Mr. Reiter

In 1988, the law firm fired its bookkeeper/office manager for alleged embezzlement. At this time, petitioner and Mr. Ludlow consulted with Marvin Reiter, a C.P.A., who had assisted

them in some cases for their clients.  Petitioner and Mr. Ludlow hired Mr. Reiter to do monthly accounting for the law firm and to prepare their personal tax returns.

Although Mr. Reiter never prepared a formal engagement letter for his work for the law firm, the limited scope of his accounting responsibilities for the law firm was spelled out in the cover letters he sent to the law firm each month.  Mr. Reiter performed "compilation" accounting for the law firm.  In other words, he relied on the law firm's representations regarding its income and expenses and did not perform an independent verification of the information provided to him.

Mr. Reiter set up an accounting system for the law firm to report its income and expenses.  Mr. Reiter's accounting system for the law firm was as follows:  The law firm would have two business bank accounts--a general operating account and a client trust account.  During the years in issue, the law firm maintained a general operating account at Bank of America (general operating account).  During the years in issue, the law firm maintained a client trust account at Security Pacific National Bank (client trust account).  The bank records for the general operating account and the client trust account were mailed to the law firm's address.

Proceeds of settlements and lawsuits, and funds belonging to clients, were deposited into the client trust account.  Funds

deposited into the client trust account had not been earned by the law firm. Funds in the client trust account did not affect the law firm's income or expenses, and had no tax significance, as they were client funds held in trust.

All business income was to be deposited into, and all business expenses were to be paid out of, the general operating account. This allowed Mr. Reiter and his staff to "pick up" the income and expenses of the law firm. This included distributions from the client trust account to the law firm. As fees were earned they were to be distributed to the law firm from the client trust account and deposited in the general operating account. Petitioner gave her employees instructions on how to distribute funds from her cases and regarding the disbursement sheet for the client trust account.

Petitioner or Mr. Ludlow had to sign checks for business expenses. During the years in issue, only petitioner and Mr. Ludlow had signatory authority on the general operating account and the client trust account.

Under Mr. Reiter's accounting system for the law firm, income of the law firm not deposited into the general operating account was not picked up as income. Mr. Reiter's system was explained to petitioner, Mr. Ludlow, and the employees of the law firm. Mr. Reiter's staff also knew how the accounting system worked.

Petitioner's Control of the Law Firm

Petitioner and Mr. Ludlow were the only attorneys working at the law firm during the years in issue. Petitioner practiced mainly family law. Mr. Ludlow practiced family law, criminal law, civil law, probate law, and personal injury law.

As Mr. Ludlow grew more ill, petitioner took over running the law firm. By 1988, after firing the law firm's bookkeeper/office manager, petitioner had taken complete control of the law firm's financial operations. During the years in issue, petitioner ran the law firm--she was in charge of its business and financial aspects. Petitioner was a hands-on manager.

Mr. Ludlow did not handle the financial aspects of the law firm. Mr. Ludlow did not deal with checks that came to the law firm. Mr. Ludlow did not get involved in deciding where checks were deposited. The law firm's employees did not talk to Mr. Ludlow about where to deposit checks. Petitioner directed her employees as to how and where to deposit the law firm's earnings.

The law firm's bills would be shown to petitioner, and petitioner would approve them. The law firm's employees then did the billing and gave the billing statements to petitioner.

Petitioner was responsible for reviewing client and third party checks that came to the law firm. Petitioner wrote, signed, and approved most of the checks written on the general

operating account and the client trust account. After the office manager was fired, it was the law firm's office procedure to give client checks directly to petitioner.

Petitioner never informed her employees that checks made payable to the law firm were deposited into accounts other than the general operating account or the client trust account. Employees of the law firm would not be aware of checks (income) that were not deposited into the general operating account or client trust account.

Records Sent to Mr. Reiter's Office

Petitioner instructed her employees to contact Mr. Reiter to learn what documents he wanted sent to him monthly. Mr. Reiter made a list of items to be sent to his office monthly. Petitioner knew what was on this list and that the client trust account register was not sent to Mr. Reiter. Petitioner told her employees what items to send to Mr. Reiter on a monthly basis.

During the years in issue, each month Mr. Reiter's office received a manilla envelope from the law firm containing the law firm's banking and bookkeeping records for the past month (the monthly envelope). The records contained inside the monthly envelopes ordinarily consisted of the following: (1) The monthly statement, the check stubs, the canceled checks, and a handwritten list (schedule) of all deposits for the month for the general operating account; and (2) the monthly statement and the

canceled checks, but no check register, no deposit slips, no "pegboard register", and no handwritten journal, for the client trust account. The deposits into the general operating account had been classified by the law firm's employees as law firm income, rental income, loan repayments, etc., and they noted which deposits were not income to the law firm.

Mr. Reiter's Bookkeeping and Accounting for the Law Firm

Mr. Reiter's staff would use the schedule of deposits to calculate the law firm's monthly income. After Mr. Reiter's staff finished inputting the law firm's monthly financial data, the law firm's records were stored at Mr. Reiter's office for later use in preparing petitioner's tax returns.

Each month, Mr. Reiter or his staff reconciled the general operating account. Mr. Reiter's staff used the bank records provided by the law firm to create a handwritten chart that reflected the beginning balance, deposits, disbursements, any outstanding checks, and any deposits in transit. Mr. Reiter and his staff compiled the law firm's business expenses on the basis of the check stubs, and the description of the expense stated therein, provided for the general operating account. The law firm did not provide Mr. Reiter or his staff with receipts, invoices, or other evidence of its expenses.

Each month, after completing the handwritten ledgers for the general operating account and the client trust account, Mr.

Reiter's staff posted the information to a "standard entries" ledger. Regarding the client trust account, only the beginning and ending balances were posted to the standard entries ledger. Mr. Reiter's staff would then post this information into a computer to generate a profit and loss statement and a balance sheet for the law firm.

Mr. Reiter was not responsible for reconciling the client trust account. For the client trust account, Mr. Reiter's staff took the starting balance, deposits, disbursements, and ending balance directly off the monthly bank statements and entered the information into a handwritten trust account ledger.

For each of the years in issue, Mr. Reiter determined the law firm's Schedule C income and expenses and prepared annual income statements by totaling the monthly statements his staff prepared based upon the information provided by the law firm.

Petitioner's Merrill Lynch Account(s)

During the years in issue, petitioner maintained two "cash management" accounts at Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch). Petitioner was the only person with signatory authority over these accounts. Petitioner's Merrill Lynch accounts were her personal accounts. Had Mr. Reiter believed the Merrill Lynch accounts to be business accounts, he would have requested the records for these accounts.

During the years in issue, several large deposits were made

into one of petitioner's Merrill Lynch accounts (Merrill Lynch
account).  The deposits were checks for the following amounts:

| Date | Amount | Year | Total |
|------|--------|------|-------|
| 11/08/88 | $25,000 | 1988 | $25,000 |
| 04/17/89 | 8,333 | | |
| | 12,500 | | |
| | 10,000 | | |
| | 4,000 | 1989 | 34,833 |
| 01/16/90 | 42,831 | | |
| 06/29/90 | 21,587 | | |
| 09/17/90 | 21,972 | | |
| | 3,750 | | |
| | 5,000 | | |
| 12/06/90 | 7,945 | | |
| | 825 | 1990 | 103,910 |
| 04/10/91 | 8,677 | 1991 | 8,667 |

Of the aforementioned checks, seven were distributions from the
client trust account for attorney's fees earned by the law firm.
They were the checks for $8,333 and $12,500 in 1989; $42,831,
$21,587, $21,972, and $7,945 in 1990; and $8,677 in 1991 (the
seven checks).  The seven checks were payable to the law firm.
Petitioner endorsed the seven checks.

The $25,000 November 8, 1988, deposit was a taxable referral
fee from attorney Bill Shernoff.

The $10,000 April 17, 1989, deposit was a taxable payment of
legal fees by a "Dr. Cole".

The $4,000 April 17, 1989, deposit was part of a State
income tax refund.  This amount had initially been deposited into
the general operating account and classified as a nonincome item
on the law firm's April 1989 list of deposits.  Accordingly, it

was not reported as income. For the years related to the State income tax refund, State income taxes had been deducted on the relevant filed Federal income tax returns.

During the years in issue, petitioner used moneys from her Merrill Lynch account to pay numerous personal expenses. This included the purchase of a new 1990 Lincoln Town Car for $43,345 and a new 1990 Lincoln Continental for $34,317.

The law firm's employees did not handle petitioner's Merrill Lynch account. The Merrill Lynch account's monthly statements were mailed to petitioner's home address. Petitioner never gave the law firm's employees (1) monthly statements for petitioner's Merrill Lynch accounts or (2) memoranda from petitioner discussing deposits into these accounts to include in the monthly envelope. The Merrill Lynch statements were not on the list of documents to be sent to Mr. Reiter monthly.

Neither Mr. Reiter nor his staff received monthly statements for petitioner's Merrill Lynch account or memoranda from petitioner discussing deposits into her Merrill Lynch accounts. No "sealed envelopes" addressed to Mr. Reiter were seen or placed by the law firm's employees into the monthly envelope. No "sealed envelopes" addressed to Mr. Reiter were received by Mr. Reiter's office. Neither Mr. Reiter nor his staff was aware that petitioner was distributing client fees from the client trust account to one of her Merrill Lynch accounts.

Preparation of Petitioner's Tax Returns

Mr. Reiter's office prepared petitioner's tax returns for the years in issue. This included preparing the Schedule C related to the law firm. Mr. Reiter did not reconcile any personal accounts of petitioner or Mr. Ludlow in order to prepare these returns. Other than yearend statements showing the total interest or dividend income earned during the year, Mr. Reiter and his staff received no records regarding petitioner's Merrill Lynch accounts or any other personal accounts.

Unaware of the income petitioner diverted to her Merrill Lynch account, Mr. Reiter and his staff did not include it in any of the monthly financial statements, the annual income statements, or the income tax returns that Mr. Reiter's office prepared for petitioner and the law firm.

Audit of Petitioner

In November or December 1991, Revenue Agent Francisco Rangel began a civil audit of petitioner and Mr. Ludlow's 1988 return. On December 11, 1991, Mr. Rangel conducted his initial interview at the law firm. Pursuant to a power of attorney, Mr. Reiter represented petitioner and Mr. Ludlow at the meeting. Mr. Ludlow attended the meeting, but petitioner did not.

Mr. Rangel asked about the law firm's business bank accounts, and he was informed that the law firm had two accounts: The general operating account and the client trust account.

Petitioner's Merrill Lynch account was not mentioned to Mr. Rangel, and he was not provided records for petitioner's Merrill Lynch accounts.

In an Information Document Request (IDR) dated January 31, 1992, Mr. Rangel asked petitioner to provide, inter alia, all bank statements, canceled checks, and stockbrokers' statements for 1988, 1989, and 1990. In an IDR dated July 2, 1992, Mr. Rangel asked petitioner to provide all Merrill Lynch statements for 1988, 1989, and 1990. Neither petitioner nor her representatives produced any Merrill Lynch records in response to the IDRs.

On April 10, 1992, Mr. Reiter and respondent executed a Form 872-A, Special Consent to Extend the Time to Assess Tax, indefinitely extending the period of assessment for petitioner's 1988 tax year.

On July 31, 1992, Mr. Rangel met with Mr. Reiter at Mr. Reiter's office. Mr. Rangel asked Mr. Reiter why he had not been provided the Merrill Lynch records. Mr. Reiter stated that he was not the problem. Mr. Reiter, on his own initiative, placed a call to petitioner on his speakerphone. During this call, petitioner told Mr. Reiter to do what he could, but that Mr. Rangel was not going to get her Merrill Lynch records. Petitioner was unaware that Mr. Rangel heard what she was saying to Mr. Reiter.

In August 1992, Jackie Anderson, C.P.A., telephoned Mr. Rangel and advised him that she was representing petitioner. Although she told Mr. Rangel that she would provide the documents he had requested, Ms. Anderson did not.

On November 20, 1992, Mr. Rangel served a summons on Merrill Lynch for petitioner's records. Mr. Rangel sent a notice copy of this summons to petitioner. Petitioner contacted Merrill Lynch, spoke to Christopher Eng in the company's compliance department, and tried to dissuade him from complying with the IRS summons. After speaking to petitioner, Mr. Eng contacted Mr. Rangel and asked whether Merrill Lynch was required to comply with the summons. Mr. Rangel advised Mr. Eng that the IRS would take enforcement action against Merrill Lynch if it did not produce the requested records. On or about December 22, 1992, Mr. Eng forwarded petitioner's Merrill Lynch statements to Mr. Rangel.

After receiving the Merrill Lynch statements, Mr. Rangel discovered checks written to petitioner out of the client trust account and deposited in her Merrill Lynch account. Mr. Rangel asked petitioner or her representative about several deposits made into her Merrill Lynch account during the years in issue, including the $25,000 deposit made in 1988. Petitioner or her representative told Mr. Rangel that the $25,000 deposit was an inheritance from the estate of Mr. Ludlow's mother, who died in 1984.

Dawn Lucius was a staff accountant employed by Ms. Anderson. Mr. Rangel and Ms. Lucius reconciled the income from the general operating account to the tax returns for 1989 and 1990. Both came to the conclusion that any deposits into petitioner's Merrill Lynch account were not reported on petitioner's returns.

Ms. Lucius approached Ms. Anderson to advise her of the situation. After advising Ms. Anderson, Ms. Lucius asked how to proceed with Mr. Rangel. Ms. Anderson replied with an obscenity that made it clear she was not to cooperate with Mr. Rangel.

During the civil audit, neither petitioner nor her representatives provided Mr. Rangel with any alleged memoranda from petitioner to Mr. Reiter about petitioner's Merrill Lynch account. Additionally, neither petitioner nor her representatives mentioned the existence of such memoranda.

On January 12 and February 11, 1993, Mr. Rangel issued IDRs for substantiation of numerous Schedule C expenses and for the general ledger for 1988, 1989, and 1990. Copies of the IDRs were sent to petitioner and her representatives. Mr. Rangel received no reply to either of these IDRs.

Bank Deposit Analysis

By examining the deposits to the general operating account and reconciling them with the tax returns, Mr. Rangel was able to determine that none of the deposits to petitioner's Merrill Lynch account were included in income on petitioner's returns.

During the years in issue, all of the deposits to the general operating account were reported as income of the law firm on the Schedules C of petitioner's returns. Any income deposited into petitioner's Merrill Lynch account was not reported on her returns.

Criminal Referral and Prosecution

In mid to late 1993, Mr. Rangel referred petitioner's case for criminal investigation. Special Agent Leonard Ramos was assigned to petitioner's case.

On July 7, 1994, Mr. Ramos served a third-party record keeper summons on Mr. Reiter seeking financial books and records of the law firm. Pursuant to the summons, Mr. Ramos received several boxes of records belonging to the law firm. These records included disbursement journals, income statements, a ledger sheet for the general operating account, and five monthly envelopes containing check stubs and bank statements from the general operating account. Mr. Ramos did not find any Merrill Lynch statements or memoranda regarding Merrill Lynch in these boxes.

During the criminal examination, neither petitioner nor her representatives provided Mr. Ramos with any memoranda from petitioner to Mr. Reiter about petitioner's Merrill Lynch account. Again, neither petitioner nor her representatives mentioned the existence of such memoranda to Mr. Ramos. Mr.

Ramos was unaware of alleged contemporaneous memoranda from petitioner to Mr. Reiter when he finalized his special agent's report.

IRS District Counsel reviewed the Criminal Investigation Division's recommendation to prosecute petitioner. Allison Rodgers Haft was assigned to review petitioner's case. As part of the review, petitioner was offered an opportunity to present the IRS with defenses to the proposed criminal charges (criminal conference). At the criminal conference, held on October 18, 1995, Ms. Haft explained the proposed charges and offered petitioner the opportunity to present any defenses.

Kenneth Gordon, a former IRS District Counsel attorney, represented petitioner during the criminal investigation and at the criminal conference. After acknowledging that any statements Mr. Gordon made could be used against petitioner in any subsequent legal proceedings, Mr. Gordon made a presentation of petitioner's defenses. At the criminal conference, Mr. Gordon did not assert that petitioner sent monthly memoranda to Mr. Reiter regarding her Merrill Lynch account. Mr. Gordon stated that petitioner had absolutely nothing to do with her Merrill Lynch account, and that she avoided mathematics, numbers, and accounting for the law firm's money.

In February 1996, Mr. Gordon sent the U.S. Department of Justice attorney reviewing petitioner's case copies of what

purported to be monthly memoranda for 1989, 1990, and 1991. The memoranda made it appear as though petitioner had informed Mr. Reiter of the deposits to her Merrill Lynch account and she had provided him with monthly statements for the account. The Department of Justice approved prosecution of petitioner and referred the case to the local U.S. Attorney's Office.

On April 19, 1996, Jerome Busch, an attorney representing petitioner prior to her indictment, sent Assistant U.S. Attorney Michael W. Emmick a package of documents purporting to be memoranda from petitioner to Mr. Reiter regarding her Merrill Lynch account. In response, the Government asked for the original documents so they could be sent out for laboratory analysis. Mr. Emmick was told that the original documents had been stolen out of the trunk of George Pearson's car. Mr. Pearson was a friend of petitioner, and supposedly was transporting the documents to Mr. Busch so that Mr. Busch could deliver them to Mr. Emmick.

After the "disappearance" of the alleged original memoranda and Merrill Lynch documents, the Government asked for the computer and printer used by petitioner to prepare the memoranda so that the Government could analyze the hard drive in order to determine the date petitioner created the documents. Neither petitioner nor her representatives provided the computer or the printer.

In 1995, Mae Roundy began working for petitioner. In 1995 or 1996, petitioner requested that Ms. Roundy pick up boxes of law firm records for her to organize. Ms. Roundy's husband picked up 18 to 19 boxes of law firm records from petitioner and took them to their home. Ms. Roundy organized documents, by year, for the years in issue.

Petitioner later told Ms. Roundy that she needed Ms. Roundy's declaration for petitioner's attorney in her criminal tax case. Petitioner prepared a declaration and asked Ms. Roundy to sign it. The declaration stated that while sorting the law firm's records Ms. Roundy found Merrill Lynch statements attached to memoranda addressed to Mr. Reiter for 1989, 1990, and 1991.

Ms. Roundy did not find Merrill Lynch statements attached to memoranda addressed to Mr. Reiter for 1989, 1990, and 1991. Ms. Roundy signed the declaration prepared by petitioner without reading it based on petitioner's misrepresentations regarding what the declaration stated and because she trusted petitioner. Ms. Roundy would not have signed the declaration had she read it. Ms. Roundy was sorry that she signed the declaration without reading it.

In early 1996, petitioner contacted Veronica Wilson, a former employee of the law firm, and asked her to sign a declaration that petitioner prepared stating that Ms. Wilson had copied Merrill Lynch statements to be sent to Mr. Reiter. Ms.

Wilson signed the declaration after crossing out the portion that referred to the Merrill Lynch account because she did not copy Merrill Lynch statements and had nothing to do with petitioner's Merrill Lynch account.  After receiving the redacted version of the declaration, petitioner called Ms. Wilson and asked her why she had crossed out portions of the declaration.  Petitioner stated that the crossed-out portions regarding her Merrill Lynch account were the most important part of the declaration. Petitioner attempted to convince Ms. Wilson that she had copied the Merrill Lynch documents when she had in fact not copied them.

Petitioner's Criminal Trial

Petitioner was the defendant in United States v. Ludlow, Case No. CR-97-727.  In the criminal case, petitioner was indicted on three counts of subscribing false income tax returns for 1989, 1990, and 1991 in violation of section 7206(1).  After being indicted, during trial, and at sentencing, petitioner was represented by Deputy Federal Public Defender Victor B. Kenton. Petitioner's criminal trial lasted 8 days.

During the criminal proceedings, petitioner admitted that the seven checks she deposited into her Merrill Lynch account totaling $20,833 in 1989, $94,335 in 1990, and $8,677 in 1991 represented business income generated by the law firm which should have been, but was not, reported on her 1989, 1990, and

1991 tax returns.  Petitioner also admitted that the $10,000 check deposited in 1989 was income in 1989.

The court instructed the jurors that petitioner contended she was not guilty of the crimes charged because she acted in good faith reliance on a certified public accountant after full disclosure of tax-related information.  The court further instructed the jurors that the good faith defense alleged by petitioner was a complete defense to the charges in the indictment and that if the jury believed petitioner acted in good faith they must acquit her.  The jury rendered a verdict finding petitioner guilty on all three counts in the indictment.  On January 28, 1999, judgment was entered in petitioner's criminal case.

Subsequent to her criminal conviction, petitioner was disbarred.

Petitioner's Disability Insurance

On June 9, 1997, petitioner applied to reinstate a disability policy (disability policy) she held through the Paul Revere Life Insurance Co. (PRLIC).  The application asked whether since the date of application for the policy(s) to be reinstated, but within 5 years, she had been treated by a physician or practitioner, been hospitalized or institutionalized, or been ill or injured.  Petitioner responded that she had been treated by a physician for a sore throat approximately 6 months before June 9,

1997--the date she signed the application. PRLIC reinstated her disability policy.

On August 5, 1997, PRLIC received an anonymous phone call from a medical doctor informing PRLIC that petitioner intended to submit a fraudulent disability claim to PRLIC. Petitioner offered this doctor money to certify a false psychiatric diagnosis. Petitioner stated that she had a doctor's stationery and prescription pad and would write the medical reports herself if necessary. The caller stated that petitioner was going to attempt to increase her disability coverage.

On August 8, 1997, petitioner applied to increase the benefit on her disability insurance. Petitioner stated in her application to increase her benefit that she earned $136,483 per year, approximately $11,374 per month (after business expenses), from her law practice.

By May 19, 1998, PRLIC learned that petitioner visited Dr. David Dixon on May 29, 1997, less than 2 weeks before the date petitioner signed the reinstatement application, with complaints of back pain and painful ambulation. PRLIC informed her that her disability policy would not have been reinstated if petitioner had answered the questions on the application truthfully and disclosed the May 29, 1997, doctor's visit.

PRLIC reported petitioner's claim as a suspected insurance fraud to the California Department of Insurance (CDI). CDI

determined there was sufficient probable cause to investigate petitioner. CDI was unable to investigate petitioner, however, because of the volume of cases under investigation and a lack of resources at the time.

Petitioner's Alleged Indigence

On August 18, 1997, 10 days after submitting her application to increase her benefit on her disability insurance and stating in her application to PRLIC that her annual income was $136,483, petitioner submitted a request for free legal representation from the Public Defender's Office on the grounds of inability to pay. To establish her indigence, petitioner submitted a financial affidavit to the U.S. District Court for the Central District of California. On this affidavit, which petitioner signed under penalty of perjury, petitioner claimed she earned $500 per month from self-employment, $250 per month from rental income, and $200 per year in interest income.

OPINION

I. Unreported Income and Disallowed Deductions

The Commissioner's determinations generally are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.[1] Rule 142(a); Welch v. Helvering,

---

[1] The examination in this case commenced prior to July 22, 1998. Accordingly, sec. 7491 is inapplicable. See Warbelow's Air Ventures, Inc. v. Commissioner, 118 T.C. 579, 582 n.8 (2002), affd. 80 Fed. Appx. 16 (9th Cir. 2003).

290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995). The U.S. Court of Appeals for the Ninth Circuit, to which an appeal of this case would lie, has held that in order for the presumption of correctness to attach to the notice of deficiency in unreported income cases,[2] the Commissioner must establish "some evidentiary foundation" linking the taxpayer to the income-producing activity, Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), revg. 67 T.C. 672 (1977), or "demonstrating that the taxpayer received unreported income", Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982); see also Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985). Once there is evidence of actual receipt of funds by the taxpayer, the taxpayer has the burden of proving that all or part of those funds are not taxable. Tokarski v. Commissioner, 87 T.C. 74 (1986).

There is ample evidence linking petitioner to an income-producing activity (the law firm), and respondent has demonstrated that petitioner received unreported income.

Respondent employed a combination of the specific items method of proof and the bank deposits method of proof to

---

[2] Although Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), was an unreported income case regarding illegal source income, the U.S. Court of Appeals for the Ninth Circuit applies the Weimerskirch rule in all cases involving the receipt of unreported income. See Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982); Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989).

reconstruct petitioner's gross receipts from the law firm. The specific items method is a direct method of proof, and it has been approved by this Court. See <u>Schooler v. Commissioner</u>, 68 T.C. 867 (1977); <u>Schaaf v. Commissioner</u>, T.C. Memo. 1991-530. The bank deposits method of proof is well established. <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); <u>Estate of Mason v. Commissioner</u>, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977).

Bank deposits are prima facie evidence of income. <u>Tokarski v. Commissioner</u>, <u>supra</u> at 77; <u>Estate of Mason v. Commissioner</u>, <u>supra</u> at 656-657. When using the bank deposits method, the Commissioner is not required to show that each deposit or part thereof constitutes income, <u>Gemma v. Commissioner</u>, 46 T.C. 821, 833 (1966), or prove a likely source, <u>Clayton v. Commissioner</u>, 102 T.C. 632, 645 (1994); <u>Estate of Mason v. Commissioner</u>, <u>supra</u> at 657. Unless the nontaxable nature of deposits is established, gross income includes deposits to bank accounts where the taxpayer has dominion and control of the funds. <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 431 (1955); <u>Davis v. United States</u>, 226 F.2d 331, 334-335 (6th Cir. 1955); <u>Manzoli v. Commissioner</u>, T.C. Memo. 1988-299, affd. 904 F.2d 101 (1st Cir. 1990).

Respondent determined, via a bank deposit analysis, that the amounts reported by petitioner as law firm income on her returns

were identical to the amounts deposited into the general operating account. Respondent then analyzed specific items deposited into petitioner's Merrill Lynch account during 1988, 1989, 1990, and 1991. These deposits included checks from the client trust account which were gross receipts of the law firm. Respondent prepared a schedule of omitted income for these items. The schedule shows that petitioner did not report substantial amounts of the law firm's gross receipts.

A. Deposits Into the Merrill Lynch Account

Petitioner never sent Mr. Reiter any information about the amounts deposited into petitioner's Merrill Lynch account, Mr. Reiter never received any records pertaining to petitioner's Merrill Lynch account, and in her criminal trial petitioner admitted that unreported income of $20,833, $94,335, and $8,677 was deposited into her Merrill Lynch account in 1989, 1990, and 1991, respectively (i.e., that she failed to report the seven checks).

Petitioner also admitted that she knew the legal fees she deposited into her Merrill Lynch account were taxable income. Petitioner stipulated she endorsed the seven checks, they were deposited into her Merrill Lynch account instead of the general operating account, and that the checks represented business income. Petitioner admitted that she received the $25,000 check (in 1988), it was a taxable referral fee, it came

from an attorney named Bill Shernoff, and it was petitioner and Mr. Ludlow's decision to deposit it in her Merrill Lynch account instead of the general operating account.

Petitioner could not remember anything regarding the nature of the $3,750 and $5,000 September 17, 1990, deposits or the $825 December 6, 1990, deposit. Respondent has proven a likely source of these deposits, and petitioner has not established the nontaxable nature of these deposits; accordingly, they are included as gross income. Commissioner v. Glenshaw Glass Co., supra at 431; Davis v. United States, supra at 334-335; Manzoli v. Commissioner, supra.

B.    Schedule C Deductions

Deductions are a matter of legislative grace; petitioner has the burden of showing that she is entitled to any deduction claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers are required to maintain books and records sufficient to establish the amount of their income and deductions. Sec. 6001; DiLeo v. Commissioner, supra at 867.

Respondent disallowed Schedule C expenses petitioner claimed relating to the law firm. Petitioner relies on her own testimony to substantiate these deductions. The Court is not required to accept petitioner's unsubstantiated testimony. See Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964). We found petitioner's testimony to be general,

vague, conclusory, and/or questionable in certain material respects. Under the circumstances presented here, we are not required to, and do not, rely on petitioner's testimony to sustain her burden of establishing error in respondent's determinations. See Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. at 77.

Petitioner also presented the testimony of Don Monson. Mr. Monson's testimony related to petitioner's alleged law library. Mr. Monson testified that around 1980 he visited Mr. Ludlow's office and saw that he had an extensive law library. When a taxpayer establishes that she has incurred deductible expenses but is unable to substantiate the exact amounts, we can estimate the deductible amount, but only if the taxpayer presents sufficient evidence to establish a rational basis for making the estimate. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In estimating the amount allowable, we bear heavily upon the taxpayer whose inexactitude is of her own making. See Cohan v. Commissioner, supra at 544.

Petitioner has not provided sufficient evidence to establish a rational basis for estimating the amount of her Schedule C

expenses.  Mr. Monson's testimony related to 1980--a decade before the years in issue and long before petitioner joined the law firm--and Mr. Monson's testimony was vague.  Accordingly, we sustain respondent's determination on this issue.

### C.    Schedule E Loss

Respondent disallowed Schedule E losses petitioner claimed relating to alleged rental real estate because petitioner failed to substantiate the loss and petitioner's son lived at the property.

Taxpayers are required to maintain books and records sufficient to establish the amount of their income and losses. Sec. 6001; DiLeo v. Commissioner, 96 T.C. at 867.  As we stated supra, the Court is not required to accept petitioner's unsubstantiated testimony.  See Wood v. Commissioner, supra at 605.  We found petitioner's testimony to be general, vague, conclusory, and/or questionable in certain material respects. Under the circumstances presented here, we are not required to, and do not, rely on petitioner's testimony to sustain her burden of establishing error in respondent's determinations.  See Lerch v. Commissioner, supra at 631-632; Geiger v. Commissioner, supra at 689-690; Tokarski v. Commissioner, supra at 77.  Accordingly, we sustain respondent's determination on this issue.

### D.    Alleged Embezzlement

Section 165(a) allows a deduction for any loss "sustained"

during the taxable year and not compensated for by insurance or otherwise, including losses arising from theft.  Sec. 165(c)(3). Petitioner has the burden of showing that a theft loss occurred. Rule 142(a).  A deduction for a theft loss can be sustained only if a theft occurred under the applicable State law.  Paine v. Commissioner, 63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975).

Petitioner did not introduce sufficient evidence at trial to establish that there was an embezzlement from the law firm, what the amount of the alleged embezzlement was, or precisely when the embezzlement occurred or was discovered.  Petitioner has failed to establish that she is entitled to a theft loss for any of the years in issue.  See, e.g., Marr v. Commissioner, T.C. Memo. 1995-250.

E.  Conclusion

Accordingly, we sustain respondent's deficiency determination.

II.  Fraud

The addition to tax and penalty in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud.  Helvering v. Mitchell, 303 U.S. 391, 401 (1938).  Fraud is intentional wrongdoing on the part of the

taxpayer with the specific purpose to evade a tax believed to be owing. McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To satisfy this burden, the Commissioner must show: (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). The Commissioner must meet this burden through affirmative evidence because fraud is never imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970).

A.    Underpayment of Tax

The Commissioner has established by clear and convincing evidence an underpayment of tax by petitioner for each of the years in issue; namely, specific items of income deposited into petitioner's Merrill Lynch account that petitioner did not report as income.

B.    Fraudulent Intent

The Commissioner must prove that a portion of the underpayment for each taxable year in issue was due to fraud. Profl. Servs. v. Commissioner, 79 T.C. 888, 930 (1982). The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199

(1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Mere suspicion, however, does not prove fraud. Cirillo v. Commissioner, 314 F.2d 478, 482 (3d Cir. 1963), affg. in part and revg. in part T.C. Memo. 1961-192; Katz v. Commissioner, 90 T.C. 1130, 1144 (1988); Shaw v. Commissioner, 27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (6th Cir. 1958).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. These badges of fraud include: (1) Understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. Spies v. United States, supra at 499; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Recklitis v. Commissioner, 91

T.C. 874, 910 (1988).  Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence.  Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.

The evidence establishing petitioner's fraudulent intent is overwhelming.  First, petitioner was an attorney, and she took one course in taxation during law school.

Second, petitioner consistently and substantially understated her income.  This is strong evidence of fraud when coupled with other circumstances.  Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980).  A pattern of consistent underreporting of income, when accompanied by other circumstances indicating an intent to conceal income, may justify the inference of fraud. Holland v. United States, 348 U.S. 121, 139 (1954).

Third, petitioner's explanations were implausible and inconsistent.  She kept changing her story to fit the circumstances she was faced with.  As the agents, and the Court, learned the truth, petitioner would change her story.

Fourth, petitioner attempted to conceal her true income by depositing it into her Merrill Lynch account.

Fifth, petitioner failed to cooperate with tax authorities. She attempted to prevent Merrill Lynch from complying with a

summons. During the civil audit and criminal investigation, petitioner repeatedly refused to claim certified letters sent to her by the IRS. Petitioner explained that she refused the letters because they were addressed to "Padgett Price Ludlow" and not to "Padgett Price". Petitioner's name was listed on each of her returns for the years in issue as "Padgett Price Ludlow". Petitioner also instructed her representatives to be uncooperative. Petitioner lied to respondent's agents and attempted to persuade her employees to lie to the Government.

Sixth, petitioner's pattern of conduct establishes an intent to mislead. Apart from the conduct just previously mentioned, petitioner apparently committed insurance fraud and a fraud on the U.S. district court when she claimed to be indigent. Petitioner also fabricated documents intended to be exculpatory.

Seventh, as stated supra, petitioner's testimony totally lacked credibility and is not worthy of belief.

Petitioner repeatedly denied ever signing a power of attorney authorizing Mr. Gordon to represent her at the criminal conference. After respondent obtained and submitted a copy of this power of attorney, petitioner claimed that she forgot signing it.

Petitioner introduced a document at trial referred to as the "pegboard register". This document was not produced at audit or during discovery. The exhibit admitted was not the original, but

a copy.  We admitted this document in part based upon petitioner's assurance to the Court that she had the original.  Several days later, petitioner admitted that she had no idea where the original of this document was.  One of petitioner's employees testified that the pegboard register was not for the client trust account ledger as petitioner alleged it to be and that petitioner may have fabricated the pegboard register.  Another of petitioner's employees did not recall seeing this register.  We conclude that the pegboard register admitted at trial was fabricated by petitioner, and that petitioner's creation and submission of this document is further evidence of fraud.

Last, although not dispositive, petitioner's conviction under section 7206(1) is probative evidence that she intended to evade her taxes.  See Wright v. Commissioner, 84 T.C. 636, 643-644 (1985).

### C.   Petitioner's Arguments

#### 1.   Mr. Reiter's Credibility

Petitioner attacks the credibility of Mr. Reiter and suggests we should not rely on his testimony.  Mr. Reiter may have engaged in some inappropriate conduct; however, in all important respects, Mr. Reiter's testimony was corroborated or supported by two members of his staff, four employees of the law firm, and/or respondent's employees who testified at trial.

Accordingly, we shall not disregard his testimony in reaching our findings and conclusions.

### 2. Reliance on Return Preparer

According to petitioner, she placed statements and memoranda regarding her Merrill Lynch account into sealed envelopes that were sent to Mr. Reiter. We conclude that petitioner did not send these memoranda or the Merrill Lynch statements to Mr. Reiter. Rather, petitioner fabricated these memoranda long after the fact.

If petitioner had told Mr. Reiter that she had distributed taxable amounts directly to her personal accounts, he would have relayed that information to his staff and made sure the additional income was reported on petitioner's tax return. The evidence is clear that petitioner failed to inform Mr. Reiter of the income she diverted to her Merrill Lynch account and she failed to provide Mr. Reiter with her Merrill Lynch account records.

The jury in her criminal trial convicted petitioner on all three counts. Accordingly, they rejected her good faith reliance on her return preparer defense, regarding 1989, 1990, and 1991, as they were instructed they must acquit her if they believed this defense.

The income was not reported on her returns not because Mr. Reiter made a mistake, but because petitioner concealed the

income and withheld information from her return preparer. Accordingly, petitioner's good faith reliance defense is without merit.  Bender v. Commissioner, 256 F.2d 771, 774-775 (7th Cir. 1958), affg. T.C. Memo. 1957-121; see Weis v. Commissioner, 94 T.C. 473, 487 (1990).

### 3.    Petitioner's Alleged Disease/Disability

Petitioner claims that since 1964 she has suffered from a severe learning disability that made her incapable of "dealing with the simplest of bookkeeping, banking, and/or financial data."  Petitioner referred to her alleged disease as dyscalculia and disnumeria.  Dyscalculia is a disease that relates to difficulty in performing simple mathematical problems.  PDR Medical Dictionary 550 (2d ed. 2000).

Petitioner introduced no expert testimony regarding her alleged medical condition.  Apart from her self-serving testimony, which was not credible, one witness testified that mathematics was not petitioner's strong point and that the witness observed petitioner use a calculator when she did mathematics.

Petitioner's records from the University of California Riverside and Western State University College of Law contain no record of petitioner's suffering from any kind of learning disability.  As a practicing attorney, petitioner regularly computed child support figures for clients.  According to her

employees and Mr. Reiter's staff, although petitioner may have had someone doublecheck her figures on occasion, she had no difficulty with numbers. Furthermore, at trial, petitioner lucidly discussed Mr. Rangel's bank deposit analysis and presented her own figures to state her position regarding the amounts in issue.

We conclude that petitioner did not suffer from a learning disability, and this is just another example of petitioner's repeated attempts to misconstrue the facts of this case and mislead the Court.

D. Conclusion

After reviewing all of the facts and circumstances, we conclude that respondent has clearly and convincingly proven that a portion of the underpayment of tax resulting from petitioner's unreported law firm income for each of the years in issue was due to fraud on the part of petitioner. Once the Commissioner establishes that a portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subjected to a 75-percent penalty, except with respect to any portion of the underpayment that the taxpayer establishes is not attributable to fraud. Secs. 6653(b)(1) and (2), 6663(a) and (b).

At trial, and in his reply brief, respondent conceded that the failure to report the $4,000 State tax refund deposited into

her Merrill Lynch account was not due to fraud and was not subject to the fraud penalty.  Petitioner has not proven that any other part of the underpayments is not attributable to fraud. Therefore, the remainder of the underpayments for 1988, 1989, 1990, and 1991 are subject to the 75-percent penalty.

III. <u>Self-Employment Tax</u>

Respondent argues that petitioner had additional self-employment income during the years in issue based on petitioner's unreported income from the law firm plus the disallowed deductions.

Section 1401 imposes self-employment tax on self-employment income.  Section 1402 defines net earnings from self-employment as the gross income derived by an individual from the carrying on of any trade or business by such individual less allowable deductions attributable to such trade or business.

Respondent argues that the law firm was a partnership, and thus petitioner was subject to self-employment tax.  Petitioner counters that the law firm was a sole proprietorship.  We need not decide this issue because petitioner's income from the law firm is subject to self-employment tax regardless of whether the law firm was a partnership or a sole proprietorship.  Sec. 1402(a).  We conclude that petitioner is liable for additional self-employment tax in 1988, 1989, 1990, and 1991 in accordance with section 1401 based upon petitioner's additional self-

employment income from her unreported income from the law firm plus the disallowed deductions.

## IV.  Period of Limitations

Petitioner argues that respondent cannot assess the tax liabilities petitioner reported on her tax returns due to the expiration of the statutory period of limitations.

In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time.  See sec. 6501(c)(1).  If the return is fraudulent, it deprives the taxpayer of the bar of the statutory period of limitations for that year.  See Badaracco v. Commissioner, 464 U.S. 386, 396 (1984); Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir. 1961), affg. T.C. Memo. 1960-32; see also Colestock v. Commissioner, 102 T.C. 380, 385 (1994).

We found that petitioner filed fraudulent income tax returns for 1988, 1989, 1990, and 1991; therefore, the periods of limitation on assessment for all of these years remain open.

In reaching all of our holdings herein, we have considered all arguments made by the parties, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.