# United States Tax Court

T.C. Memo. 2024-49

JOSEPH BELCIK, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 32770-21, 11750-22,      Filed April 22, 2024.
11753-22.

————

Joseph Belcik, pro se in Docket Nos. 32770-21 and 11753-22.

Kaylyn Belcik, pro se in Docket No. 11750-22.

*Miriam C. Dillard* and *A. Gary Begun*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*: In these consolidated cases respondent issued two notices of deficiencies to petitioner Joseph Belcik, the first for 2008–16 and the second for 2017 and 2018, determining deficiencies totaling approximately $2.7 million and additions to tax under section 6651(f)[2] for fraudulent failure to file, under section 6651(a)(2) for failure to pay tax, and under section 6654 for failure to pay estimated tax. Respondent also issued a notice of deficiency to petitioner Kaylyn Belcik

---

[1] Cases of the following petitioners are consolidated herewith: Kaylyn Belcik, docket No. 11750-22; and Joseph Belcik, docket No. 11753-22.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some dollar amounts are rounded.

[*2] for 2017 and 2018 determining deficiencies of $15,933 and $11,458, respectively, and the same additions to tax. For each year at issue respondent alternatively determined a section 6651(a)(1) failure-to-file addition to tax for both petitioners.

The issues for consideration are (1) whether Mr. and Mrs. Belcik (collectively, petitioners) had unreported income. We hold they did as set forth herein; (2) whether Mr. Belcik is liable for self-employment tax. We hold he is liable for 2008–16; and (3) whether petitioners are liable for the additions to tax listed above. We find Mr. Belcik is liable and Mrs. Belcik is not liable.

FINDINGS OF FACT

Some facts have been deemed stipulated pursuant to Rule 91(f). When the Petitions were timely filed, petitioners resided in Florida. Petitioners are married. For much of their marriage including 2008–16 Mrs. Belcik was a homemaker who was busy raising their four children and did not earn income. Petitioners filed joint returns for 1993 and 1994 and paid the tax shown as owed on the returns. Neither petitioner has filed a return since the 1994 return. Nor has either petitioner paid any income tax for any year since 1994.

I.      *Sources of Income*

A.      *Mr. Belcik's Activities*

During 2008–16 Mr. Belcik operated and earned income from a business called Direct Results Marketing (Direct Results), a printing and marketing business. In 2012 he listed his annual income on a loan application as $100,000. During 2008–18 he had signature authority over two bank accounts in the name Joseph A. Belcik DBA Direct Results Marketing at Regions Bank and Bank of America. He deposited Direct Results' gross receipts into these bank accounts and used the deposited funds to pay household and personal expenses as well as business expenses.

Mr. Belcik operated the business in a warehouse that he jointly owned with Mrs. Belcik. He hired individuals to work for his business but did not pay employment taxes on the compensation he paid them. Nor did he issue Forms W–2, Wage and Tax Statement, or Forms 1099–MISC, Miscellaneous Income, for the compensation. Some individuals who worked for Direct Results formed entities, and Mr. Belcik paid the entities for the services that the workers performed.

**[\*3]**    Sometime before or during 2008 Mr. Belcik formed Blowing Rock Ltd. (Blowing Rock) in a foreign country and opened a bank account at Regions Bank in the name Joseph A. Belcik DBA Blowing Rock Ltd. (Blowing Rock account). During 2008–18 Mr. Belcik had signature authority over that account. Blowing Rock did not have a business purpose. Mr. Belcik also used money from the Blowing Rock account to pay personal and household expenses. He transferred money among the three bank accounts. In March 2013 Mr. Belcik received $90,000 from the sale of a condominium (condo) that he had helped his father purchase, which Mr. Belcik deposited into the Blowing Rock account.

During 2006 and 2007 Mr. Belcik purchased 66,907 ounces of silver at different prices in a series of transactions for a total price of $1,053,633. In 2009 he began selling the silver and received sale proceeds in 2009, 2010, 2011, 2013, 2014, 2015, 2016, 2017, and 2018, of $52,170, $51,510, $75,498, $31,360, $92,100, $187,030, $127,959, $331,528, and $192,081, respectively, for total sale proceeds of $1,141,236, which he deposited in the Blowing Rock account.

Around 2016 Mr. Belcik stopped operating Direct Results. During 2017 and 2018 he rented out the warehouse and received rents of $90,250 and $75,734, respectively, which he deposited into a Direct Results bank account. During 2017 and 2018 Mr. Belcik bought real properties for rental or resale purposes. Around October 2017 he purchased real property on Cypress Lane, Oldsmar, Florida, which he refers to as Cypress Lake, for $12,300. In March 2018 a mortgagee foreclosed on the mortgage resulting in a judicial sale of the property. In 2018 Mr. Belcik purchased a condo on Holiday Drive, Fort Lauderdale, Florida, which he refers to as Coconut Grove, for $25,100. Later that year a mortgagee foreclosed on the mortgage, and the property was sold in a judicial sale. Mr. Belcik did not receive any proceeds from the two foreclosure sales. In 2017 and 2018 Mr. Belcik purchased two other real properties on Covina Way, Lake Worth, Florida, and Covina Way, Boca Raton, Florida, respectively. In addition to the warehouse rents and silver sale proceeds, Mr. Belcik deposited $48,720 in the Blowing Rock account in 2018.

B.    *Information Returns*

During the years at issue Mr. Belcik was issued the following information returns:  (1) for 2013 Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., issued by Ohio Police and Fire Pension Fund

[*4] reporting a gross distribution and taxable amount of $1,000; (2) for 2014 Form 1099–B, Proceeds From Broker and Barter Exchange Transactions, issued by First Energy Corp. reporting proceeds of $34,372; (3) for 2015 Form 1099–INT, Interest Income, issued by Youngstown Firefighter Credit Union reporting $144 in interest income; (4) for 2013, 2014, 2015, 2016, 2017, and 2018 Forms 1099–DIV, Dividends and Distributions, issued by First Energy Corp. reporting ordinary dividends of $586, $815, $95, $95, $95, and $95, respectively; and (5) for 2018 Form 1099–S, Proceeds From Real Estate Transactions, issued by Hometown Title and Closing Services, LLC, reporting gross proceeds of $26,500 on the transfer of real property on Phoenix Avenue, Oldsmar, Florida (Phoenix Avenue property). Mr. Belcik did not report or pay tax on these items of income.

### C.    *Mrs. Belcik's Partnership Income*

During 2017 and 2018 Mrs. Belcik owned a 49% interest in UberWorld Travel, LLC (UberWorld), a partnership for federal tax purposes. UberWorld filed partnership returns for 2017 and 2018 with Schedules K–1, Partner's Share of Income, Deductions, Credits, etc., that show that Mrs. Belcik's shares of partnership income for 2017 and 2018 were $461 and $5,055, respectively, and her share of capital gain for 2018 was $2,511.

## II.    *Audit and Appeal*

In 2014 the Internal Revenue Service (IRS) initiated an audit for Mr. Belcik's 2008–13 tax years and assigned Revenue Agent (RA) John Clark to the audit. The IRS expanded the audit to include 2014–18 and also initiated an audit for 2017 and 2018 for Mrs. Belcik. The IRS transferred the audits for 2017 and 2018 for both petitioners to RA Jeffery Page.

From the beginning of the audit Mr. Belcik refused to cooperate and asserted frivolous tax-protester arguments. In July 2014 RA Clark issued a summons to Mr. Belcik. After Mr. Belcik provided only minimal documentation, most of which related to the purchase of a car and car payments, the IRS filed suit in district court to enforce the summons. In district court Mr. Belcik asserted that he did not have any records and that he was not required to keep records of his expenses. He failed to appear at multiple court-ordered hearings, and in April 2016 the district court ordered his arrest. *United States v. Belcik*, No. 8:15-mc-2-T-23MAP, 2016 WL 836691 (M.D. Fla. Mar. 4, 2016) (order). Mr. Belcik

[*5] spent four days incarcerated and agreed to produce evidence to the IRS to secure his release. He met with RA Clark but claimed the Fifth Amendment privilege in response to 75% of RA Clark's questions. During the course of the summons proceedings Mr. Belcik continuously defied the district court's authority and bombarded the court with "specious," "oppressive," "groundless," "repetitive" motions that were "contumacious violations" of the court's orders. *Id.* at *1. In April 2020 RA Clark issued third-party summonses to Bank of America and Regions Bank for Mr. Belcik's bank records. Mr. Belcik moved to quash the summonses in district court.

After obtaining the bank records RA Clark and RA Page conducted bank deposits analyses of the Direct Results and Blowing Rock bank accounts to reconstruct Mr. Belcik's income for 2008–16 and 2017 and 2018, respectively. The RAs calculated that Mr. Belcik had annual gross receipts from 2008–18 as follows: $1,392,167, $900,753, $977,285, $750,357, $651,270, $615,971, $641,614, $328,021, $222,945, $335,603, and $240,352, for total gross receipts of approximately $7 million. The RAs eliminated transfers among the three accounts and did not double count any funds. Included in the gross receipts were deposits of the proceeds from Mr. Belcik's sales of silver.

RA Clark examined the disbursements from the accounts during 2008–16 as potential business expenses. As part of his analysis, he summarized the amounts of the disbursements on the basis of each payee's identity in the bank records. However, he was not able to verify whether any amounts were deductible business expenses because Mr. Belcik refused to provide substantiation that the RA requested of the amounts or business purposes of the disbursements. Accordingly, RA Clark determined that Mr. Belcik could not deduct any business expenses for 2008–16. Likewise, RA Page could not verify whether any disbursements from the bank accounts during 2017 and 2018 were deductible business expenses and determined that Mr. Belcik could not claim any deductions.

In February 2020 RA Clark issued a revenue agent's report (RAR) to Mr. Belcik for 2008–16, and in June 2021 RA Page issued an RAR separately to each petitioner for 2017 and 2018. RA Clark and RA Page made the initial determinations to assert the additions to tax listed above and obtained timely written supervisory approval of the additions pursuant to section 6751(b). Petitioners each filed administrative appeals with the IRS Independent Office of Appeals (Appeals). Appeals Officer (AO) Frederick Anderson was assigned to both petitioners'

[*6] appeals. He requested that Mr. Belcik provide substantiation for any business expenses, but Mr. Belcik again refused to provide any substantiation and failed to cooperate with the AO. In April 2021 the IRS prepared substitutes for returns (SFR) for Mr. Belcik for 2008–16, and in July 2021, for each petitioner individually for 2017 and 2018. Each SFR met all requirements of section 6020(b). Respondent included the bank deposits in Mr. Belcik's income for 2013–18 as well as the warehouse rents and the amounts shown on information returns.

III.    *Notices of Deficiency*

On July 22, 2021, respondent issued a notice of deficiency to Mr. Belcik for 2008–16 determining the following deficiencies and additions to tax:

| Year | Deficiency | Additions to Tax | | |
|------|------------|------------------|--------------|----------|
|      |            | § 6651(f) | § 6651(a)(2) | § 6654 |
| 2008 | $511,516 | $370,849 | $127,879 | $16,438 |
| 2009 | 328,426 | 238,109 | 82,107 | 7,863 |
| 2010 | 356,449 | 258,426 | 89,112 | 7,644 |
| 2011 | 269,605 | 195,464 | 67,401 | 5,338 |
| 2012 | 232,553 | 168,601 | 58,138 | 4,169 |
| 2013 | 244,399 | 177,189 | 61,100 | 4,389 |
| 2014 | 268,430 | 194,612 | 67,108 | 4,820 |
| 2015 | 121,285 | 87,932 | 30,321 | 2,184 |
| 2016 | 77,107 | 55,903 | ---[3] | 1,843 |

---

[3] When the notices of deficiency were issued, the section 6651(a)(2) addition to tax for failure to pay, if applicable, continued to accrue for 2016 and 2018 for Mr. Belcik and for 2017 and 2018 for Mrs. Belcik. The addition is calculated from the due date of the return at a rate of .5% for each month, or fraction thereof, of nonpayment, not to exceed 25% of the underpayment. When the notices of deficiency were issued, the accruals had not reached the 25% maximum.

**[\*7]**   On February 22, 2022, respondent issued a notice of deficiency to each petitioner for 2017 and 2018 determining deficiencies and additions to tax as follows:

*Mr. Belcik*

| Year | Deficiency | Additions to Tax | | |
|------|------------|------------------|------------------|------------------|
|      |            | § 6651(f) | § 6651(a)(2) | § 6654 |
| 2017 | $163,728 | $118,703 | --- | $3,920 |
| 2018 | 114,003 | 82,652 | --- | 3,697 |

*Mrs. Belcik*

| Year | Deficiency | Additions to Tax | | |
|------|------------|------------------|------------------|------------------|
|      |            | § 6651(f) | § 6651(a)(2) | § 6654 |
| 2017 | $15,933 | $11,551 | --- | $381 |
| 2018 | 11,458 | 8,307 | --- | 372 |

For 2017 and 2018 respondent asserted a whipsaw position with respect to the warehouse rents by including the entire amount in each petitioner's gross income. On brief he asserts that the rents should be equally divided between petitioners for each year.[4]

IV.   *Court Proceedings*

In the Amended Petitions, petitioners asserted numerous frivolous arguments, and we struck most paragraphs as meritless. We advised petitioners that they had a serious misunderstanding of the law

---

[4] Respondent allowed each petitioner a standard deduction for the filing status married filing separately and one personal exemption. Petitioners have substantiated that they paid real estate tax on their personal residence that is allowable as an itemized deduction for 2008–18 of $5,487, $5,379, $6,723, $6,902, $7,354, $8,040, $8,152, $8,208, $8,088, $7,884, and $8,204, respectively.

**[\*8]** and warned them that if they continued to pursue frivolous arguments, we would likely impose an additional penalty under section 6673 up to $25,000. *See* Order (Nov. 4, 2022) in Docket Nos. 32770-21 and 11750-22; Order (Nov. 3, 2022) in Docket No. 11753-22. After our warning, petitioners continued to file numerous motions and discovery motions asserting baseless, frivolous arguments including challenging the Court's authority and often repeating the same arguments that we had struck from the Amended Petitions. When we denied petitioners' groundless discovery motions, they filed new discovery motions asserting more frivolous arguments the same or the next day. They filed requests for admissions that did not relate to the issues before the Court for the apparent purpose of advancing their frivolous arguments in violation of Rule 90. *See* Rule 90 (requiring requests for admissions be warranted by existing law and precluding the parties from using requests for improper purposes such as to harass the opposing party, to cause unnecessary delay, or needlessly to increase litigation costs). Petitioners also refused to stipulate any facts or exhibits.[5]

Before trial we directed Mr. Belcik to identify each specific canceled check that he intended to offer as an exhibit at trial to substantiate his business expenses by exhibit and Bates numbers and warned petitioners that voluminous, disorganized documents might not be admitted into evidence. *See* Order (Oct. 6, 2023) in Docket Nos. 32770-21, 11750-22, and 11753-22. Mr. Belcik did not adhere to our Order. We nevertheless admitted into evidence at trial over 3,000 pages of unorganized bank statements and canceled checks on the condition that Mr. Belcik present the documents in an organized, logical fashion on brief. We directed Mr. Belcik to summarize the business expenses for each year, to state the amount paid to each payee, and to identify the exhibit in the record by exhibit and Bates numbers that establish the amount of each expense. We further directed him to assert the business purpose for each expense that he identified in this manner. In his briefs Mr. Belcik did not make any attempt to identify the expenses in the manner that we directed.

## OPINION

Gross income means "all income from whatever source derived" including income derived from business. § 61(a); *Commissioner v.*

---

[5] Petitioners object to certain exhibits including bank records. The exhibits are authentic per deemed stipulation. Moreover, Mr. Belcik admitted that the bank records were his. We overrule petitioners' objections.

**[*9]** *Glenshaw Glass Co.*, 348 U.S. 426, 429–31 (1955). Gain from the sale of property equals the amount realized less the taxpayer's adjusted basis in the property. § 1001(a). In unreported income cases, the Commissioner must establish an evidentiary foundation connecting the taxpayer with an income-producing activity, *Llorente v. Commissioner*, 649 F.2d 152, 156 (2d Cir. 1981), *aff'g in part, rev'g and remanding in part* 74 T.C. 260 (1980), or demonstrate that the taxpayer actually received income, *Edwards v. Commissioner*, 680 F.2d 1268, 1270–71 (9th Cir. 1982); *Walquist v. Commissioner*, 152 T.C. 61, 67 (2019). Once the Commissioner makes the required threshold showing, the burden shifts to the taxpayer to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. *Walquist*, 152 T.C. at 67–68 (citing *Helvering v. Taylor*, 293 U.S. 507, 515 (1935)).

I.     *Gross Income*

    A.     *Bank Deposit Analysis*

The IRS reconstructed Mr. Belcik's income using the bank deposits method. Taxpayers must maintain and keep accurate records establishing the amount of their gross income. § 6001. When a taxpayer fails to do so, the IRS may reconstruct the taxpayer's income under any method that, in its opinion, clearly reflects income. § 446(b); *Petzoldt v. Commissioner*, 92 T.C. 661, 693 (1989). The IRS's reconstruction of income "need only be reasonable in light of all surrounding facts and circumstances." *Petzoldt*, 92 T.C. at 687. Bank deposits are prima facie evidence of income, and the Commissioner need not show a likely source of the income. *See Parks v. Commissioner*, 94 T.C. 654, 658 (1990); *Tokarski v. Commissioner*, 87 T.C. 74, 77 (1986). Mr. Belcik admitted that he operated and earned income from a successful direct marketing business during 2008–16 and engaged in commercial and residential rental activities during 2017 and 2018. He also admitted that he sold silver.

Under the bank deposits method, we presume that all money deposited into a taxpayer's bank account is taxable unless the taxpayer shows that particular deposits are nontaxable or were previously reported as income. *Price v. United States*, 335 F.2d 671, 677 (5th Cir. 1964); *Tokarski*, 87 T.C. at 77. The IRS must take into account any nontaxable sources of income that it has knowledge of. *Price*, 335 F.2d at 677; *DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992). The IRS eliminated transfers among Mr. Belcik's three

**[*10]** bank accounts and did not double count any deposits. Through its bank deposit analysis, the IRS determined that Mr. Belcik received unreported gross receipts for each year at issue in the amounts set forth above, which totaled approximately $7 million.

After the IRS reconstructs a taxpayer's income, the taxpayer bears the burden of proving that the IRS's implementation of the bank deposits method was unfair or inaccurate. *See Clayton v. Commissioner*, 102 T.C. 632, 645–46 (1994); *DiLeo*, 96 T.C. at 871–72. Around 2016 Mr. Belcik stopped operating Direct Results. Thus, no deposits during 2017 and 2018 were Direct Results' gross receipts. Deposits in those years were from rents, silver sales, and real estate activities. Mr. Belcik credibly identified two sources of deposits other than Direct Results' gross receipts: silver sales during 2009–11 and 2013–2018 and the sale of a condo in 2013. He established that he deposited proceeds from silver sales in the amounts listed above for total sale proceeds of $1,141,236. He also established that he had a total cost basis in the silver of $1,053,633. As part of the Rule 155 computations for Docket Nos. 32770-21 and 11753-22, the parties are to match the purchase and sale of silver using the first in, first out method to determine Mr. Belcik's cost basis in the silver that he sold each year and to calculate the amount of long-term capital gain or loss for each year.[6] *See* § 1012.

In 2013 Mr. Belcik received $90,000 from the sale of a condo that he had helped his father purchase. Mr. Belcik did not provide any information about the purchase such as whether he lent the money to his father or whether they co-owned the condo. Nor did Mr. Belcik present any evidence of his cost basis in the condo even if he did co-own it for purposes of determining the amount of gain or loss on the sale. Petitioners did not address the condo sale in their briefs. Accordingly, we hold that Mr. Belcik is taxable on the $90,000 as long-term capital gain. Mr. Belcik did not identify any nontaxable sources of the deposits nor errors in respondent's calculation of the bank deposits during 2008–16. In 2018 Mr. Belcik deposited $48,720 into the Blowing Rock account. He admitted that he engaged in real estate activities during 2017 and 2018. Mr. Belcik did not establish a nontaxable source for the $48,720. Accordingly, we hold that the $48,720 is gross income. Additionally, in 2018 Mr. Belcik transferred the Phoenix Avenue property for gross proceeds of $26,500 as shown on Form 1099–S. We

---

[6] Substantiation for basis and sale proceeds is at Exhibit 27-P, Bates Nos. 00048-00050.

[*11] find that $26,500 is included in Mr. Belcik's 2018 gross income because he did not establish his basis in the property.[7]

In summary, we find that Mr. Belcik had gross receipts from Direct Results as determined in the notice of deficiency for 2008–16 less the proceeds from the silver sales and $90,000 condo sale proceeds. He also had capital gains or losses from the silver sales and $90,000 in capital gain from the 2013 condo sale. For 2017 and 2018 Mr. Belcik had capital gains or losses from the silver sales and gross income of $48,720 in addition to the warehouse rents discussed below. Additionally, he had income in the amounts reported on the information returns.

B.     *Rental Income*

Respondent argues that the warehouse rents should be equally divided between petitioners for 2017 and 2018 because they jointly owned the warehouse.[8] Petitioners argue that the warehouse rents are attributable solely to Mr. Belcik. We agree with petitioners. Mr. Belcik had control over the rents and deposited them into the bank accounts over which he had signatory authority. Accordingly, we find that the rents were his income. *See Price v. Commissioner*, T.C. Memo. 2004-103 (holding that a taxpayer's gross income includes deposits into bank accounts over which he has dominion and control); *see also Zaklama v. Commissioner*, T.C. Memo. 2012-346, at *18 (sustaining a determination that rent reflected in a deposited check was the income of the taxpayer to whom the check was written). Accordingly, we find that rents of $90,250 and $75,734 are includible in Mr. Belcik's gross income for 2017 and 2018, respectively. No part of the rent is includible in Mrs. Belcik's income for those years.

C.     *UberWorld Income*

As she was a partner in UberWorld, Mrs. Belcik's shares of partnership income were $461 and $5,055 for 2017 and 2018, respectively, and her share of capital gain was $2,511 for 2018. These amounts are Mrs. Belcik's only income. Her income for each year is less than the standard deduction for a married person filing separately and one personal exemption. Accordingly, Mrs. Belcik does not have taxable

---

[7] On the basis of our review of the record, Mr. Belcik did not establish his holding period for the Phoenix Avenue property.

[8] The parties stipulated that petitioners jointly owned the warehouse, and documents in the record indicate joint ownership.

[*12] income for 2017 or 2018, and we do not sustain the deficiencies against her.

## II.    *Deductible Expenses*

Taxpayers may deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. § 162(a). Deductions are a matter of legislative grace, and taxpayers have the burden of proving that they are entitled to business expense deductions; they must prove the amount and the business purpose of each expense. Rule 142(a); *see INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Technically speaking, the cost of goods sold (COGS) is not a deduction; it is an adjustment subtracted from gross receipts in determining gross income. Treas. Reg. § 1.61-3(a); *see Metra Chem Corp. v. Commissioner*, 88 T.C. 654, 661 (1987). Taxpayers cannot claim an immediate deduction for capital expenditures. § 263(a); *see Woodward v. Commissioner*, 397 U.S. 572, 575 (1970) (explaining that taxpayers cannot deduct a capital expenditure under section 162). Rather, the taxpayer may deduct capital expenditures over time through depreciation or amortization. *See, e.g.*, §§ 167, 195(b).

To obtain deductions, taxpayers must keep sufficient records to substantiate the amounts and business purposes of business expenses and provide them to the IRS to enable the IRS to determine the correct tax liability. *See* § 6001; Treas. Reg. § 1.6001-1(a). They are also required to maintain sufficient records to substantiate the amount of COGS. *See Nunn v. Commissioner*, T.C. Memo. 2002-250. When a taxpayer does not adequately substantiate an expense, the Court is permitted to estimate the amount of the expense when the Court is persuaded from the record that the taxpayer has incurred the expense for business purposes. *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930). However, the Court "bear[s] heavily if it [so] chooses upon the taxpayer whose inexactitude is of his own making." *Id.* For the Court to estimate the amount of the allowable deduction, the taxpayer must present some credible evidence that provides a rational basis for the estimate. *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985). We are not obligated to make an estimate under the *Cohan* rule where there is insufficient evidence to allow us to make a rational estimate. *See Lerch v. Commissioner*, 877 F.2d 624, 627–29 (7th Cir. 1989) (refusing to apply the *Cohan* rule where the taxpayer failed to present evidence to support claimed deductions), *aff'g* T.C. Memo. 1987-295. The taxpayer must supply some factual basis for an estimate; otherwise, the allowance

**[\*13]** would amount to "unguided largesse." *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957).

Section 274(d) imposes heightened substantiation requirements that override the *Cohan* rule for certain types of business expenses including automobiles and entertainment expenses.[9] *See* § 280F(d)(4)(A)(i), (iii); *Sanford v. Commissioner*, 50 T.C. 823, 827–28 (1968) (holding that we may not apply the *Cohan* rule to approximate expenses covered by section 274(d)), *aff'd per curiam*, 412 F.2d 201 (2d Cir. 1969); Treas. Reg. § 1.280F-6(b)(1)(i), (iii). Taxpayers must substantiate automobile expenses by adequate records or sufficient evidence that corroborates their own statements, the amount, time and place, and business purpose for each expenditure. Temp. Treas. Reg. § 1.274-5T(c). Taxpayers must maintain a record in the form of an account book, a diary, a log, a statement of expenses, trip sheets, or a similar record as well as evidence documenting the amounts of the expenditures. *Id.* subpara. (2). An actual contemporaneous log is not strictly required, but records made at or near the time of the expenditure have greater probative value than records created subsequently. *Id.* subpara. (1).

A.    *Direct Results' Business Expenses: 2008–16*

Mr. Belcik asserts that he is entitled to deduct disbursements from the Direct Results bank accounts as business expenses. He did not substantiate most disbursements except through the bank records that the RAs obtained through third-party summonses, which we find wholly insufficient to substantiate most of the alleged business expenses. Significantly, he did not introduce any documentation to substantiate the business purpose of the disbursements. He asserts that some disbursements were for entertainment and automobile expenses but wholly failed to satisfy the section 274(d) substantiation requirements. Accordingly, he may not deduct any automobile or entertainment expenses for the years at issue.

Mr. Belcik ran a successful business during 2008–16 and clearly incurred legitimate business expenses. Had he filed returns or produced documentation for the expenses during the audit, appeal, or trial, it is likely that he would have been able to deduct more business expenses. However, he refused to cooperate with the IRS and fought the summons

---

[9] Section 274(d) was amended by the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13304(a)(2)(A), 131 Stat. 2054, 2124. The amendment was made effective for amounts paid or incurred after December 31, 2017. *Id.* § 13304(e), 131 Stat. at 2126.

**[\*14]** of his substantiation documentation in district court for over five years with baseless, frivolous arguments. During this litigation he failed to cooperate with respondent. At trial he stated that he had additional records to substantiate the disbursements but did not offer them into evidence. He failed to follow the Court's instructions in our pretrial order and at trial to organize and summarize the bank records. Instead, substantial parts of his briefs consist of frivolous arguments. The briefs make minimal references to the record; and when they do cite the record, it is a blanket citation of exhibits that consist of approximately 3,500 pages including 3,000 pages of the disorganized bank records and canceled checks. Such references to the record are unhelpful, and we may treat Mr. Belcik's failure to address the specific expenses for deduction as a concession. *See Ernest S. Ryder & Assocs., Inc., APLC v. Commissioner*, T.C. Memo. 2021-88, at \*173–74.

Nevertheless, we have attempted to sift through the voluminous, disorganized documents. Many checks were for personal and household expenses, which Mr. Belcik acknowledged at trial and conceded were not deductible. Some checks were made out to Mr. Belcik or to "cash." Mr. Belcik testified that some disbursements were for equipment purchases, i.e., they were for capital expenditures. He testified about the business purpose of some payments on the basis of the payees' identities, and we instructed Mr. Belcik to summarize this testimony and further provide such explanation as to other payees on brief. In the light of Mr. Belcik's failure to make any attempt to follow our instructions, we find that he lacks credibility in his testimony as to the business purpose of the payments evidenced by the canceled checks. He failed to point specifically to the documents in the record that substantiate the amounts of his claimed expenses. He admitted that he hired workers and failed to issue any information returns reporting their compensation to the IRS. He also admitted that he did not pay employment taxes. We find that the canceled checks are insufficient to substantiate the business purpose of the disbursements and hold that the disbursements were not deductible business expenses except to the extent stated below.

We find that Mr. Belcik may deduct amounts paid to the United States Postal Service, Tampa Envelop, JK&M Ink, and Mac Paper during 2008–16 to the extent that there are canceled checks in the

[*15] record that establish the amounts of the expenses.[10] Mr. Belcik has also substantiated to our satisfaction payments of property tax on the warehouse for 2008–18 of $15,515, $13,556, $11,846, $11,559, $11,335, $11,862, $11,636, $12,886, $12,291, $13,730, $16,992, and $15,913, respectively. Apart from these expenses, we have no means to determine the business purposes of the disbursements. We do not know whether the payments were made for legitimate, currently deductible, business expenses, capital expenditures, or personal expenses. We are not bound to accept his unverifiable, undocumented testimony.

Mr. Belcik's ineligibility to claim business expenses is his own fault because of his willful behavior including his continued refusal to cooperate during the audit, the appeals, and this litigation and his decision to continuously assert frivolous arguments in this litigation in his effort to avoid paying tax for nearly two decades.[11] Before trial we told Mr. Belcik that we would not accept disorganized records into evidence, but at trial we ended up giving him another opportunity to organize the canceled checks and to explain the business purposes of the disbursements on brief. We gave Mr. Belcik ample opportunity to provide his business records in an organized manner during and after trial, and he failed to take advantage of that opportunity just as he failed to take advantage of the numerous opportunities that the IRS gave him to provide the records during the audit and the appeals.

We will not estimate deductible expenses under the *Cohan* rule in these circumstances particularly in the light of Mr. Belcik's lack of credibility.[12] *See Ernest S. Ryder & Assocs., Inc., APLC*, T.C. Memo. 2021-88, at *173–74 (finding that where the taxpayer made general references to the record, using the *Cohan* rule to estimate expenses is not warranted). We are "not obligated to protect taxpayers from the

---

[10] For Mr. Belcik to deduct these expenses, we direct him to identify each payment to these payees by exhibit number, Bates number, and check number as part of the Rule 155 computation. His failure to identify the expenses in this precise manner will result in the disallowance of deductions for the expenses in the Rule 155 computation.

[11] In their briefs petitioners also repeat their argument that respondent did not send the notices of deficiency by certified or registered mail. We already rejected this argument when we denied petitioners' motion to dismiss.

[12] Mr. Belcik seeks to rely on the disbursement summary that RA Clark prepared during the audit. However, RA Clark credibly testified that he could not verify the business purpose of any disbursements in the summary or determine whether the disbursements were for deductible business expenses because Mr. Belcik refused to cooperate during the audit. RA Clark testified that he included in the summary expenses that Mr. Belcik did not substantiate.

**[\*16]** results of their own obstinacy, and there is no duty to invoke the *Cohan* rule in aid of taxpayers who willfully disobey the Tax Court." *Lerch v. Commissioner*, 877 F.2d at 629. Mr. Belcik did not provide a credible evidentiary basis of business purpose to allow us to apply the *Cohan* rule except for the expenses identified above. *See Vanicek*, 85 T.C. at 742–43. Moreover, it is not clear to us that Mr. Belcik may deduct any other disbursements because of his use of the bank accounts to pay personal and household expenses and his admission that some expenses were capital expenditures.

### B.    *Business Expenses and Losses: 2017 and 2018*

For 2017 and 2018 Mr. Belcik asserts that he is entitled to deduct expenses incurred to renovate real property, depreciation on the fair market value of the warehouse, and the purchase price of a new automobile. We hold that he may not deduct these expenses. Generally, taxpayers may not immediately deduct amounts paid for permanent improvements to property or the costs of a capital asset, i.e., property that will last for more than one year. *See* § 263; *Woodward v. Commissioner*, 397 U.S. at 575 (explaining that a taxpayer cannot deduct a capital expenditure under section 162). Rather, taxpayers may deduct depreciation of property "used in the trade or business" or "held for the production of income" for exhaustion, wear and tear, and obsolescence. § 167(a). For depreciation deductions, taxpayers must establish (1) the existence of a trade or business; (2) the use of property in the trade or business; and (3) a depreciable basis in the asset by showing the cost of the property and its useful life, as well as any previously allowable depreciation. *See Cluck v. Commissioner*, 105 T.C. 324, 337 (1995).

Mr. Belcik may not deduct depreciation for the warehouse because he has not established his cost basis.[13] Moreover, depreciation is based on the taxpayer's cost basis in the property, not the property's fair market value. § 167(c)(1). Likewise, Mr. Belcik has not established that the purported renovation expenses are currently deductible. We find that the expenses are capital expenditures that would be part of his basis in the real property for purposes of determining gain or loss on the property's sale to the extent he can substantiate the expenditures in the year of sale. Finally, Mr. Belcik may not deduct the purchase price of the automobile because an automobile is a capital asset. Taxpayers can

---

[13] As stated above, Mr. Belcik may deduct real estate tax that he paid on the warehouse for 2017 and 2018.

**[\*17]** depreciate an automobile if they establish that they used it for business purposes. Mr. Belcik may not deduct depreciation for the automobile because he did not establish his business use of the automobile through adequate records. *See* § 274(d); *Finney v. Commissioner*, T.C. Memo. 1980-23 (holding that the taxpayer has the burden to prove business use).

Mr. Belcik also asserts that he lost $12,300 and $21,500, respectively, in the foreclosures of the Cypress Lake and Coconut Grove properties, which he seeks to deduct. Taxpayers are entitled to deduct losses sustained during the taxable year that were not compensated for by insurance or otherwise. § 165(a). We find that Mr. Belcik may deduct these losses.[14] A foreclosure is a sale or exchange of the foreclosed property from which gain or loss is realized for purposes of section 1001(a). *See Helvering v. Hammel*, 311 U.S. 504, 510–11 (1941). Accordingly, Mr. Belcik is treated as having disposed of his interests in the Cypress Lake and Coconut Grove properties and has established losses equal to the purchase prices. *See* § 1001(a) (providing that gain or loss recognized on a sale or exchange is the difference between the amount realized from the disposition and the taxpayer's adjusted basis in the property).

III.    *Self-Employment Tax*

Section 1401 imposes self-employment tax on self-employment income. *See* Treas. Reg. § 1.1401-1(a). Section 1402(a) defines net earnings from self-employment as the gross income derived by an individual from the carrying on of any trade or business by such individual less allowable deductions attributable to such trade or business. During 2008–16 Mr. Belcik operated Direct Results. He did not address whether he is liable for self-employment tax on his income from Direct Results on brief. We deem that he has conceded respondent's determination that he is liable for self-employment tax. *See Collins v. Commissioner*, T.C. Memo. 2002-115 (stating that we may deem a taxpayer to have conceded an issue where he made no argument at trial or on brief relating to that issue). Accordingly, we find that Mr. Belcik's income from Direct Results is subject to self-employment tax for 2008–16. *See* § 1402(a); *Price*, T.C. Memo. 2004-103.

---

[14] Mr. Belcik has not established that he was engaged in a trade or business of real property rental or resale. However, this does not affect the amount or character of his loss deductions.

[*18] Mr. Belcik did not operate Direct Results and did not earn income from it during 2017 and 2018. Rather, his bank deposits were the warehouse rents and silver sale proceeds as well as some deposits from unknown sources but possibly related to his real estate activities. Accordingly, we find that Mr. Belcik is not subject to self-employment tax for 2017 and 2018. *See* § 1402(a)(1) (excluding rent from self-employment income), (3)(A) (excluding gain or loss on the sale of a capital asset).

IV.    *Additions to Tax*

Having found that Mrs. Belcik is not liable for a deficiency for 2017 or 2018, we address only Mr. Belcik's liability for additions to tax. For each year at issue respondent determined that Mr. Belcik is liable for additions to tax under section 6651(f) for fraudulent failure to file, under section 6651(a)(2) for failure to pay, and under section 6654 for failure to pay estimated tax. We sustain each addition to tax.

A.    *Fraudulent Failure to File*

Section 6651(a)(1) provides for an addition to tax of 5% of the tax required to be shown on a return for each month for which there is a failure to file a tax return, up to 25% in the aggregate. Section 6651(f) increases the addition to tax for fraudulent failure to file to 15% of the tax required to be shown on the return for each month, up to 75% in the aggregate. An SFR prepared by the Commissioner under section 6020(b) is not a return for purposes of section 6651(f). *See* § 6651(g)(1).

The Commissioner bears the burden of proving that the taxpayer had a filing obligation and fraudulently failed to file a return. *See* § 6651(a)(1), (f). The Commissioner must prove fraud by clear and convincing evidence. *See* § 7454(a); Rule 142(b); *DiLeo*, 96 T.C. at 873. Fraud is established by showing that a "taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such tax." *Clayton*, 102 T.C. at 647. Fraud may be established by circumstantial evidence. *Petzoldt*, 92 T.C. at 699. The same factors relevant to determining fraudulent intent under section 6663 are relevant to determining fraudulent intent for failure to file. *See Clayton*, 102 T.C. at 653.

The Court looks to the following nonexclusive badges of fraud to determine fraudulent intent: (1) failure to file tax returns; (2) failure to report income over an extended period; (3) failure to furnish the IRS with access to records or to cooperate with taxing authorities; (4) failure

**[\*19]** to keep adequate books and records; (5) concealment of bank accounts or assets from IRS agents; (6) willingness to defraud another in a business transaction; (7) implausible or inconsistent explanations of behavior or arguments; (8) failure to make estimated tax payments; and (9) engaging in illegal activities. *See Bradford v. Commissioner*, 796 F.2d 303, 307–08 (9th Cir. 1986), *aff'g* T.C. Memo. 1984-601; *Gould v. Commissioner*, 139 T.C. 418, 446 (2012), *aff'd*, 552 F. App'x 250 (4th Cir. 2014); *Niedringhaus v. Commissioner*, 99 T.C. 202, 211 (1992); *Recklitis v. Commissioner*, 91 T.C. 874, 910 (1988). Fraudulent intent is determined by looking at the entire record and the taxpayer's conduct. *DiLeo*, 96 T.C. at 874. No single factor is determinative for establishing fraud; the existence of several factors is persuasive circumstantial evidence of fraud. *Niedringhaus*, 99 T.C. at 211; *Petzoldt*, 92 T.C. at 700.

Respondent has carried his burden of showing that Mr. Belcik was required to file a return, and failed to file one, for each year at issue. *See Simmons v. Commissioner*, T.C. Memo. 2009-283, slip op. at 9–11. Respondent produced certified SFRs for the years at issue, and Mr. Belcik admitted that he operated a business during 2008–16 and received rents and engaged in real estate activities during 2017 and 2018. Respondent has established that Mr. Belcik had a filing obligation and failed to file. *See Gates v. Commissioner*, 135 T.C. 1, 14 (2010).

After thorough review of the record, we conclude that most badges of fraud apply to demonstrate that Mr. Belcik acted with fraudulent intent. Mr. Belcik's business experience further supports a determination of fraudulent intent. He is a successful businessman who operated a business for over two decades. During 2008–16 his business had gross receipts of approximately $6 million. The fact that he filed returns for 1994 supports an inference that he knew that he had a filing obligation and his failure to file was fraudulent. *See Niedringhaus*, 99 T.C. at 211; *Tooke v. Commissioner*, T.C. Memo. 1977-91, *aff'd*, 595 F.2d 1229 (9th Cir. 1979) (unpublished table decision). He failed to file returns on the basis of frivolous, tax-protester reasons. Petitioners have not paid tax for any year since 1994. This nearly 20-year pattern of failing to file returns and failing to report income from a successful business is strong evidence of fraud. *See Holland v. United States*, 348 U.S. 121, 139 (1954); *Beaver v. Commissioner*, 55 T.C. 85, 93 (1970); Vanover v. Commissioner, T.C. Memo. 2012-79, slip op. at 12. Mr. Belcik's failure to pay estimated tax also indicates fraudulent intent. *See Miller v. Commissioner*, 94 T.C. 316, 336 (1990); *Putnam v. Commissioner*, T.C. Memo. 2015-160, at \*23. Mr. Belcik had a pattern of tax avoidance and concealment in which he paid workers for the

[*20] services that they provided to Direct Results and failed to issue to them Forms W–2 or Forms 1099–MISC for their compensation that he now seeks to deduct. *See Petzoldt*, 92 T.C. at 701–02. His actions could have enabled his workers to avoid reporting and paying tax on their compensation.

Additionally, Mr. Belcik attempted to conceal income and assets by opening the Blowing Rock account. He transferred over $900,000 to it during the years at issue. He used the Blowing Rock account to buy and sell silver from a foreign-based mint. He paid household and personal expenses through his business bank accounts. He failed to maintain adequate books and records of his business operations. He failed to cooperate during the audit and appeal and fought the summonses that the IRS issued to him for over five years with a series of baseless motions asserting the same frivolous arguments including 15 motions after the district court warned him to stop filing such motions. He failed to comply with the district court's orders to provide information to the IRS and failed to appear before the court on multiple occasions. The magistrate judge described the motions as "specious," "oppressive," and "contumacious violations" of the court's order. *Belcik*, 2016 WL 836691, at *1. Mr. Belcik provided records only to secure his release from incarceration on contempt charges. However, after his release, he continued to assert frivolous arguments in his dealings with the IRS and refused to answer most of RA Clark's questions or provide substantiation for any expenses.

We conclude that respondent has established by clear and convincing evidence that Mr. Belcik's failures to file were due to fraud and sustain respondent's determination that Mr. Belcik is liable for a section 6651(f) increased addition to tax for each year at issue.

B.    *Failure to Pay*

Section 6651(a)(2) provides for additions to tax when a taxpayer fails to pay timely the tax shown on a return unless the taxpayer proves that the failure was due to reasonable cause and not due to willful neglect. Taxpayers have reasonable cause for their failures to pay if they exercised ordinary business care and prudence in providing for payment and were nevertheless either unable to pay the tax or would suffer an undue hardship. Treas. Reg. § 301.6651-1(c)(1).

Respondent must produce evidence of a tax return for Mr. Belcik showing a tax liability. *See* §§ 7491(c), 6651(a)(2); *Wheeler v.*

**[\*21]** *Commissioner*, 127 T.C. 200, 210–12 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008). An SFR prepared by the IRS pursuant to section 6020(b) is treated as a return filed by the taxpayer for purposes of section 6651(a)(2). *See* § 6651(g). Respondent has met his burden of production by producing copies of the SFRs that the IRS prepared for Mr. Belcik for the years at issue. Mr. Belcik did not pay the tax shown on the SFRs. He has not established, or even argued, that he had reasonable cause for his failure to pay or that the failure to pay was not due to willful neglect. Accordingly, we sustain the section 6651(a)(2) addition to tax for each year at issue.

### C.    *Failure to Pay Estimated Tax*

Section 6654(a) imposes an addition to tax on an individual who underpays his estimated tax. The addition to tax is calculated with reference to four required installment payments of the taxpayer's estimated tax liability. § 6654(c) and (d). Each required quarterly installment is equal to 25% of the taxpayer's "required annual payment," which is defined as the lesser of 90% of the tax required to be shown on the current year's return or (2) 100% of the tax shown on the prior year's return. § 6654(c) and (d)(1). When a taxpayer did not file a return for the year at issue or the immediately preceding year, the required annual payment is 90% of tax due for the year at issue. § 6654(d)(1)(B).

Respondent produced evidence that Mr. Belcik had an obligation to pay estimated tax for each year at issue, i.e., he had a required annual payment, and that he did not pay any estimated tax. *See Wheeler*, 127 T.C. at 211–12. Further, nothing in the record indicates that a statutory exception applies. *See* § 6654(e). Accordingly, we sustain the section 6654(a) addition to tax for Mr. Belcik for 2008–18.

### V.    *Penalties for Maintaining Frivolous Positions*

Section 6673(a)(1) authorizes the Court to impose a penalty up to $25,000 payable to the United States whenever it appears to the Court that the taxpayer instituted or maintained the proceeding primarily for delay or that the taxpayer's position in the proceeding is frivolous or groundless. The purpose of section 6673 is to compel taxpayers to conform their conduct to settled tax principles and to deter the waste of judicial and IRS resources. *Salzer v. Commissioner*, T.C. Memo. 2014-188.

Although not requested to do so by respondent, we will require Mr. Belcik to pay a section 6673 penalty of $2,000. We warned Mr. Belcik

**[\*22]** that he would be subject to a section 6673 penalty if he continued to repeat frivolous arguments that we struck from his Amended Petition. Nevertheless, he repeated the same frivolous arguments in numerous baseless motions and in his posttrial briefs, wasting the Court's and respondent's time and resources. Mr. Belcik's conduct throughout his case has been inconsistent with that of any taxpayer who wants to truthfully and efficiently resolve his tax liability. We again warn Mr. Belcik that further assertion of frivolous arguments in any future documents filed in his cases may result in an additional penalty of a higher amount.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

*Decisions will be entered under Rule 155 in Docket Nos. 32770-21 and 11753-22.*

*Decision will be entered for petitioner in Docket No. 11750-22.*